GUILIO J. AND EDITH CONTI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Conti v. Commissioner
Docket No. 15131-90
United States Tax Court
T.C. Memo 1992-616; 1992 Tax Ct. Memo LEXIS 645; 64 T.C.M. (CCH) 1093; October 19, 1992, Filed *645 Decision will be entered under Rule 155. R determined deficiencies in income tax and additions to tax for 1986 and 1987 using the net worth plus expenditures method. Ps claim that the increase in net worth determined by respondent was due to withdrawals from an $ 800,000 cash hoard and $ 550,000 in loans from their son. Held: R's determination of deficiencies as amended is sustained. Held further: Additions to tax under secs. 6653(b) and 6661 as amended are sustained. For Petitioners: Mark C. Pierce, Robert B. Pierce, and Paul T. Mengel. For Respondent: Dennis C. Driscoll. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION COLVIN, Judge: Respondent determined deficiencies in income tax of $ 116,410.57 for 1986 and $ 390,227.28 for 1987, and additions to tax for fraud under section 6653(b) and substantial understatement of income tax under section 6661. In the answer respondent alternatively asserted the addition to tax for negligence under section 6653(a). By amended answer, respondent asserted that petitioners' deficiency was $ 217,237 for 1986 and $ 339,021 for 1987. On brief respondent concedes that petitioners' deficiencies do not exceed $ 206,702 for 1986 *646 and $ 322,343 for 1987. After concessions, the issues for decision are: 1. Whether respondent's determination, including that petitioners had a $ 150,000 cash hoard on December 31, 1985, was arbitrary. We hold that it was not. 2. Whether petitioners had an $ 800,000 cash hoard on December 31, 1985, or received $ 550,000 in loans from their son during 1986 and 1987. We hold that they did not. 3. Whether petitioners are entitled to a $ 5,047 deduction for sales tax for 1986, and a $ 410 deduction for tax return preparation fees for 1987. We hold that they are not. 4. Whether petitioners have additional income of $ 893 for 1986 from the sale of their residence. We hold that they do. 5. Whether petitioners are liable for additions to tax for fraud under section 6653(b). We hold that they are. 6. Whether petitioners are liable for additions to tax for substantial understatement of tax under section 6661. We hold that they are. 7. Whether petitioners are liable for additions to tax for negligence under section 6653(a). We need not reach this issue in light of our holding on fraud. Petitioners offered into evidence the results of polygraph tests to corroborate their *647 cash hoard claim. We previously ruled that the results of these tests are not admissible. Conti v. Commissioner, 99 T.C.     (1992). Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. References to petitioners are to Mr. and Mrs. Conti. 1. Petitioners and Their Family
Petitioners are husband and wife who resided in Birmingham, Michigan, when the petition was filed. They were married in 1949 and had three sons, Chris, Gary, and Mark (the oldest). Petitioners' sons were in their late twenties to late thirties and petitioners were in their late sixties during the years at issue. a. Mr. Conti
Mr. Conti was born in 1921. He has a fifth grade education, and began work at age 14. Mr. Conti worked for Ford Motor Co. (Ford) beginning in 1937, and retired in 1985. From 1971 through 1985 he received $ 679,206 in wages from Ford. He was in reasonably good health during the years at issue. Mr. Conti served in the United States Army from 1942 *648 through 1945. He fought in World War II in North Africa and Europe. He was paid $ 60 per month by the Army. Mr. Conti inherited $ 10,000 from his father in 1970, and $ 12,637 from his brother in 1984. Mr. Conti never made bank deposits. He gave all of the cash he acquired to Mrs. Conti. Mr. Conti purchased a deferred annuity for $ 150,000 on November 27, 1981. He withdrew $ 152,020.51 from the annuity account in July 1984, and received a final distribution of $ 38,610.33 on February 9, 1988. b. Mrs. Conti
Mrs. Conti is a high school graduate with varied work experience before her marriage. She handled the family finances. In 1986 and 1987 she made more than 300 deposits in at least three banks totaling over $ 950,000. At least 130 of the deposits were cash, totaling over $ 375,000. Also in those years petitioners bought and sold at least 12 real properties. These activities are discussed below. Mrs. Conti is a little hard of hearing and has high blood pressure. c. Mark Conti
Mark Conti, petitioners' son, is a college graduate. In the 1980s, he syndicated video games, financed and developed racket clubs, and rehabilitated real estate. In 1986 and 1987 he *649 worked from 80 to 90 hours per week in his parents' real estate activity and in other business activities. His parents paid him about $ 30,000 in 1986 and $ 20,000 in 1987 for his services. During those years he also worked for Kathy Wilson Management Co. and Kathy Wilson individually. His total reported adjusted gross income was $ 43,000 for 1986 and $ 29,000 for 1987. d. The D'Annunzios
David D'Annunzio, Mrs. Conti's father, was born in 1881 and died in 1960. Rosa D'Annunzio, Mrs. Conti's mother, was born in 1881 and died in 1973. From about 1953 to 1966, petitioners and Mrs. Conti's mother lived together in Detroit, Michigan. Alfred D'Annunzio, Mrs. Conti's brother, died in 1981 following an extended illness. He had $ 2,907 in Federal and State income tax refunds for 1981, all of which Mrs. Conti received. Alfred D'Annunzio bequeathed all of his property to Mrs. Conti. His property, except for cash and other personal property, was held jointly by himself and Mrs. Conti. e. Lifestyle
Petitioners had personal living expenses including Federal income tax payments of $ 38,487.69 for 1986 and $ 22,658.29 for 1987. They received Social Security payments of $ 12,313 *650 in 1986 and $ 13,459 in 1987. Their lifestyle was not lavish. 2. Petitioners' Bank and Brokerage Accounts
Petitioners maintained several bank and brokerage accounts. The bank accounts were at Bloomfield Savings & Loan Association, Standard Federal Bank, Sterling Federal Bank, Sterling Federal Savings & Loan Association, Comerica Bank, First America Bank, Manufacturers National Bank, National Bank of Detroit, and Michigan National Bank. The brokerage accounts were with Merrill Lynch and E.F. Hutton. Petitioners also had individual retirement accounts at Comerica Bank. Mrs. Conti made at least the following deposits to their bank accounts in 1986 and 1987 (see appendix A): All Deposits
Cash Deposits
Coin Deposits
Number
Total
Average
Number
Total
Average
Number
Total
Bloomfield Savings & Loan, 1986
26
$ 137,772.81
$ 5,298.95
25
$ 47,550.00
$ 1,902.00
9
$ 2,170
Standard Federal Bank, 1986
14
78,023.96
5,573.14
14
30,100.00
2,150.00
6
1,882
Sterling Federal Savings, 1986
4
9,800.00
2,450.00
4
9,800.00
2,450.00
0
0
Bloomfield Savings & Loan, 1987
37
124,919.78
3,376.21
20
67,650.00
3,382.50
0
0
Standard Federal Bank, 1987
38
201,286.95
5,297.03
33
85,125.00
2,579.55
8
2,200
Sterling-Federal Savings, 1987
133
399,403.69
3,003.04
35
138,083.90
3,945.00
0
0
*651 Mrs. Conti and her brother had joint bank accounts with a $ 160,894.42 total balance when closed in 1981. As of June 27, 1980, Mrs. Conti and her brother jointly owned common stock which cost $ 72,391. Petitioners had the following account balances in banks at the end of the years indicated: Bank
1985
1986
1987
Bloomfield Savings
$ 78,400.39 $ 22,457.43 $ 40,454.90 Comerica
34,590.50
33,160.27
62,583.22
Standard Federal
[1]    13,690.66
32,069.51
Manufacturers
19,493.31
26,863.82
70,154.94
National Bank
First America
21,621.64
[1]    59,584.61
Michigan National
8,354.91
22,181.61
[1]   Bank
National Bank
40,664.35
26,078.62
46,888.83
of Detroit
Sterling Federal
[1]    3,722.74
2,387.02
Savings
Totals    $ 203,125.10
$ 148,155.15
$ 314,123.03
Petitioners sold 1,734 shares of stock from 10 companies in 1982 for a $ 7,635 profit. Petitioners sold 406 shares of stock from two corporations in 1985 for a $ 10,900 profit. Petitioners invested $ 77,979 in *652 12 companies in 1985 and $ 26,047 in 7 companies in 1986. 3. Petitioners' Real Estate Business
Petitioners began investing in real property in the early 1980s at the suggestion of their son Mark. They bought, sold, rented, and renovated real estate. Mrs. Conti handled the banking activity for the business. Petitioners had an office suite on Adams Street with two rooms. The sign on the door said, "Edith J. Conti". They had four employees. Petitioners had business assets with cost of acquisition values on the last day of 1986 and 1987 as follows: Business Assets
1986
1987
Phone
$ 640
$ 640
Furniture
25,221
25,221
Dump truck
15,547
Truck
8,135
Petitioners' real estate purchases and sales included the following: Date
Address
Activity
Comments
Oct. 31, 1983
31491 Bellvine
purchase
$ 51,315.52
Birmingham, MI
outstanding
mortgage
Oct. 26, 1984
552 Hannah
purchase
assumed $ 64,000
Birmingham, MI
mortgage
July 10, 1985
552 Hannah
sale
$ 8,123 gain
Birmingham, MI
Aug. 26, 1985
399 Baldwin
purchase
Birmingham, MI
Feb. 7, 1986
399 Baldwin
sale
Birmingham, MI
N/A
745 Abbey
purchase
Birmingham, MI
Aug. 13, 1986
745 Abbey
sale
Birmingham, MI
June 12, 1986
887 Wimbleton
purchase
$ 96,250 mortgage
Birmingham, MI
N/A
1231 Emmons
purchase
$ 29,500 mortgage
Birmingham, MI
July 31, 1986
963 Woodward
purchase
$ 46,000 mortgage
Birmingham, MI
Aug. 8, 1986
4891 Yorkshire
sale
petitioners'
Detroit, MI
residence
Oct. 16, 1986
480 Yarmouth
purchase
Birmingham, MI
Oct. 31, 1986
319 Henley
purchase
$ 317,500 mortgage
Birmingham, MI
Nov. 14, 1986
Henley
purchase
unimproved lot
Birmingham, MI
March 27,
31660 Glencoe
sale
1987
May 22, 1987
2655 E. Maple
purchase
condominium
Birmingham, MI
June 30, 1987
423 Totting Lane
purchase
demolished house and
Birmingham, MI
subdivided lots
Oct. 15, 1987
423 Totting Lane
sale
subdivided lots
Birmingham, MI
N/A
600-602 Lincoln
purchase
Birmingham, MI
*653 N/A = no date available. The total cost of petitioners' real estate held on December 31, 1985, was $ 255,630; $ 1,177,704 on December 31, 1986, and $ 1,279,704 on December 31, 1987. The total cost of real estate improvements made by petitioners was $ 65,712 on December 31, 1985, $ 186,927 on December 31, 1986, and $ 394,252 on December 31, 1987. Petitioners' total mortgages payable were $ 48,872.17 on December 31, 1985, $ 461,330.34 on December 31, 1986, and $ 137,070.61 on December 31, 1987. Mrs. Conti received $ 39,900 from the sale of a home at 13958 Parkgrove, Detroit, Michigan, that she held jointly with her mother and brother. 4. Petitioners' Net Worth as of December 31, 1985
The parties stipulated to the items in the net worth analysis, except for cash on hand. We find that petitioners' cash on hand as of December 31, 1985, was $ 150,000 (as determined by respondent), and that they received no loans from Mark in 1986 and 1987. Petitioners' contentions to the contrary are discussed below. Adding cash on hand of $ 150,000 (as determined by respondent) to the stipulation results in the following: ASSETS
1985
1986
1987
Cash on hand
$ 150,000.00
$ 150,000.00
$ 150,000.00 Cash in bank
223,125.10
148,155.04
314,123.03 IRA's
9,000.00
2,250.00 Merrill Lynch:
Cash  590.15
1.32
CMA funds  74,306.50
55,105.00
14,475.00 CD Phila. Savings Fund  20,000.00
CD Northwest Svgs.  50,000.00 Investments
77,979.00
26,047.00
Real estate
225,630.00
1,177,704.00
1,279,704.00 Real estate improvements
65,712.00
186,927.00
394,252.00 Business assets
25,861.00
49,543.00 TOTAL ASSETS     $ 846,342.75
$ 1,769,800.36
$ 2,254,347.03 LIABILITIES  Mortgages payable
$ 48,872.17
$ 461,330.34
$ 137,070.61 Accumulated depreciation
18,111.00
43,368.00
126,049.00 TOTAL LIABILITIES     $ 66,983.17
$ 504,698.34
$ 263,119.61 NET WORTH
$ 779,359.58
$ 1,265,102.02
$ 1,991,227.42 Less: prior year
779,359.58
1,265,102.02 Net worth increase
485,742.44
726,125.40 Additions to net worth
38,487.69
151,419.29 Total net worth increase
524,230.13
877,544.69 Less: deductions
40,074.00
19,982.00 Corrected adjusted gross income
484,156.13
857,562.69 Adjusted gross income per return
48,401.00
(94,316.00)
Unidentified income
$ 435,755.13
$ 951,878.69 *654 On December 31, 1985, petitioners had cash of $ 100,000 in their home and $ 20,000 in a safety deposit box. 5. Petitioners' Income Tax Returns
The C.P.A. firm of Grey, Trepeck and Cohen, P.C., prepared petitioners' Federal income tax returns from 1981 through the years at issue. Their return for 1984 was prepared by Theodore Cohen, C.P.A. Their returns for 1985, 1986, and 1987 were prepared by Leonard A. Grey, C.P.A. (Mr. Grey). Petitioners gave some schedules of income and expenses, closing documents for real estate transactions, check stubs, Forms W-2 and 1099, and brokerage statements to Mr. Grey to prepare petitioners' returns. Sales, income, rents, and gain from the real estate transactions were included in petitioners' income tax returns by Mr. Grey and accounted for in the years in issue. Mrs. Conti wrote a $ 410 check to Grey & Trepeck, P.C., on May 13, 1987, with the memo, "taxes for 1986". Petitioners reported that they received $ 166,786 in interest and $ 38,335 in dividends on their income tax returns from 1971 through 1985. They received taxable refunds from 1971 through 1985 totaling $ 16,109 and other income of $ 1,938. Petitioners had a $ 12,000 nonbusiness *655 bad debt in 1984. 6. The Audit
Revenue Agent Pamela Keysor conducted the audit in this case. She obtained a bachelor's degree in accounting in 1985 from Ferris State University, and she prepared corporate tax returns for a C.P.A. firm for 2 years. She was hired by the Internal Revenue Service (IRS) in September 1987 and underwent training for about 3 months. The Contis' case was one of her first auditing assignments. It was her first net worth case. Ms. Keysor was not a certified public accountant as of the date of trial. She has taken the C.P.A. exam five times and has passed the practice and law portions, but has not passed the auditing and theory parts of the exam. Ms. Keysor began to audit petitioners for 1986 and 1987 around March 1988. Mark Conti dealt with Mr. Grey, petitioners' representative, on behalf of petitioners during the audit. Mark Conti provided documentation to Mr. Grey. As a part of the audit, Ms. Keysor met with Mrs. Conti, Mark Conti, and Mr. Grey on April 18, 1988. Except for Mrs. Conti's attendance of the April 18, 1988, meeting, petitioners had no contact with Mr. Grey during their audit. Ms. Keysor interviewed Mrs. Conti during the April *656 18 meeting. In that interview Mrs. Conti told Ms. Keysor that petitioners had about $ 100,000 cash at their residence and over $ 20,000 in a safe deposit box. Mrs. Conti stated that the cash was partly from a $ 200,000 to $ 250,000 gift from her mother and partly from a $ 300,000 inheritance from her brother. Ms. Keysor's handwritten notes state, "Taxpayer keeps large sum of cash on hand, ($ 150,000)." Mrs. Conti did not say that the source of the cash was Mr. Conti's earnings from Ford and his military service, or loans from Mark Conti. After meeting with Ms. Keysor on April 27, 1988, Mr. Grey met with Mark Conti to prepare petitioners' response to Ms. Keysor's questions. Mr. Grey told Mark Conti the amount of cash on hand that would be required to account for the net worth increase. On May 23, 1988, Mr. Grey sent a letter to Ms. Keysor which stated that petitioners had the following cash on hand: Safety Deposit
Total Cash
Boxes
House
on Hand
Beginning of 1986
$ 300,000 +
$ 150,000 +
$ 450,000 +
End of 1986
100,000 +
175,000 +
275,000 +
Mark Conti, not petitioners, gave all of this information to Mr. Grey. OPINION 1. Respondent's Determination *657 Using the Net Worth Method
Respondent used the net worth method to determine petitioners' income for the years in issue. Under the net worth method, income is computed by determining a taxpayer's net worth (excess of assets at cost over liabilities) at the beginning and end of a year. The difference between the two figures is the increase in net worth. This difference is increased by adding nondeductible expenditures, including living expenses, and by subtracting gifts, inheritances, loans, and the like. Holland v. United States, 348 U.S. 121, 125 (1954); United States v. Giacalone, 574 F.2d 328, 330-331 (6th Cir. 1978). An increase in a taxpayer's net worth, plus his nondeductible expenditures, less nontaxable receipts, may be considered taxable income. Holland v. United States, supra.
In a net worth case, respondent must: (1) Establish, with reasonable certainty, an opening net worth, and (2) either (a) show a likely income source, or (b) negate possible nontaxable income sources. Holland v. United States, supra at 132-138; Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), *658 affd. 926 F.2d 1470 (6th Cir. 1991); Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Petitioners argue that the determination is arbitrary because none of the Holland requirements have been met. We disagree. a. Opening Net Worth
The taxpayer's net worth at the beginning of the taxable year is a key element in a net worth case. Fuller v. Commissioner, 313 F.2d 73, 77 (6th Cir. 1963), modifying T.C. Memo. 1961-262; Brodella v. United States, 184 F.2d 823, 825 (6th Cir. 1950). Petitioners contend that respondent's determination is arbitrary because of respondent's opening net worth figure. We disagree. With the exception of cash on hand and loans from Mark, the parties agree as to the opening net worth for each of the years in issue. Cash on hand is a part of the opening net worth. See Estate of Phillips v. Commissioner, 246 F.2d 209, 213 (5th Cir. 1957), revg. and remanding T.C. Memo. 1955-139. *659 Petitioners allege they had about an $ 800,000 cash hoard at the beginning of 1986, and about $ 550,000 in loans from Mark in 1986 and 1987. As discussed next, we conclude that these claims are implausible, inconsistent in significant ways with their previous statements to IRS agents and their own advisers, and uncorroborated by records. b. Petitioners' Cash Hoard Claim
Respondent determined petitioners' opening net worth to be $ 150,000 based on an interview of Mrs. Conti by respondent's revenue agent. Petitioners argue that this determination is arbitrary and that respondent's revenue agent was unqualified and inexperienced. Respondent's revenue agent testified that Mrs. Conti told her that petitioners had $ 100,000 cash at home and $ 20,000 in a safety deposit box. Respondent's agent rounded up and approximated $ 150,000 as the amount of cash on hand. In essence, respondent's agent gave petitioners a $ 30,000 benefit of the doubt. We do not find that that makes the determination arbitrary, and we see no reason to respond separately to petitioners' attack on respondent's agent's qualifications. At trial, petitioners and their son Mark testified that petitioners accumulated *660 an $ 800,000 cash hoard over about 50 years. Petitioners allege that they had about $ 800,000 in cash as of December 31, 1985, composed of personal savings, gifts, and inheritances. There is no documentation for these assertions. Petitioners offer no corroboration for their testimony on these points. The objective evidence shows that Mrs. Conti made large cash deposits during the years in issue. She testified that she was very cautious and believed in depositing a small amount in a lot of banks. However, the objective evidence indicates the opposite is true. Petitioners had extensive investment activity from 1980 through 1985. This indicates that they were not as financially unsophisticated as they wish to appear. Petitioners give no persuasive reason why they would forgo earning interest on the massive claimed cash hoard, and then suddenly invest it. Petitioners' frequent bank deposit activity of several thousand dollars during the years at issue is also inconsistent with their claimed cash hoard; regular weekly deposits are more likely to be from a regular source of income than from a withdrawal of a cash hoard of currency savings accumulated over a lifetime. Mrs. Conti's *661 explanation that she deposited cash on a weekly basis because it was as the business needed it is not supported by the documentary evidence. Petitioners placed mortgages on real property they owned while they allegedly had their cash hoard. They also allege borrowing money from Mark. Evidence of borrowing supports an inference that they had no cash hoard because a cash hoard negates the necessity to borrow. Thomas v. Commissioner, 223 F.2d 83, 88 (6th Cir. 1955), revg. and remanding a Memorandum Opinion of this Court dated Oct. 30, 1953; see Holland v. United States, 348 U.S. 121, 133 (1954) (taxpayers would not have lost possession of their cafe and furniture and accumulated unpaid debts if they had a cash hoard of $ 104,000). Petitioners have increased the amount of their claimed cash hoard throughout the life of this case. In the initial examination interview, Mrs. Conti stated that petitioners had $ 100,000 in cash at their home and $ 20,000 in a safe deposit box. After reviewing respondent's net worth analysis, petitioners' accountant sent respondent a letter stating that petitioners had $ 450,000 cash on hand *662 at the beginning of 1986. When they filed their petition in this case, petitioners claimed that they had $ 800,000 in cash in the beginning of 1986. As to the source of their alleged cash hoard, petitioners suggest that about $ 800,000 came from personal savings, gifts from Mrs. Conti's mother, and an inheritance from Mrs. Conti's brother, and about $ 550,000 came from loans from Mark during 1986 and 1987. Petitioners assert that the sources of the cash hoard that they accumulated include: Mr. Conti's sale of Nazi weapons during World War II; gifts from Rosa D'Annunzio, who petitioners said accumulated cash from selling wine and beer during Prohibition; savings from 16 years with few or no expenses while living with Mrs. Conti's mother; and various gifts and inheritances from family members. Petitioners allege that they obtained two beige fireproof metal boxes from Alfred D'Annunzio in 1980, and that they hid cash in a green-colored metal box that they got from Mrs. Conti's mother. Petitioners testified to the dimensions of each of those containers. They claimed that Mrs. Conti's family accumulated large amounts of cash, from no substantiated source, and without any records. *663 We find petitioners' claims to be improbable and unbelievable. Other than petitioners' testimony, there is no evidence of their personal savings. Gifts from Mrs. Conti's mother are likewise uncorroborated. Moreover, it seems unlikely that either Mrs. Conti's mother or brother had the ability to provide funds as claimed. Most of the events alleged to be the source of the cash hoard occurred long ago. The events are not susceptible to being checked. Mrs. Conti's mother and brother and Mrs. Conti's father are deceased. Mrs. Conti's mother allegedly dealt largely in cash and allegedly purchased a house with cash. Presumably the sale of beer and wine during Prohibition was in cash. There is no documentary evidence of these nontaxable funds, inheritances, or gifts. As discussed below, we believe that the claimed loans from Mark are a fabricated defense. Overall, we have found petitioners' and Mark's testimony to be unbelievable, improbable, and unreasonable. Petitioners offered no credible, independent support for any of their claims. Petitioners did not offer to respondent any evidence which respondent may have failed to investigate as leads. A taxpayer cannot complain about *664 the sufficiency of an investigation where he has offered no leads. United States v. Penosi, 452 F.2d 217, 220 (5th Cir. 1971); Blackwell v. United States, 244 F.2d 423, 429 (8th Cir. 1957). Petitioners argue that this case is like Goodman v. Commissioner, T.C. Memo. 1961-201. We disagree. In that case we found that the Commissioner's opening net worth for the taxpayers was not sound because the Commissioner failed to include a substantial amount of undeposited cash which the taxpayer had. In the present case, respondent included undeposited cash of $ 150,000, and we have found that petitioners have not proven that they had any more undeposited cash. Thus, Goodman does not assist petitioners. c. Loans From Mark
Petitioners claim that their son Mark Conti lent them $ 124,947.50 in 1986 and $ 450,077.58 in 1987. At trial Mark Conti produced a schedule that he prepared shortly before trial showing loans to his parents of $ 124,947.50 in 1986 and $ 457,077.58 in 1987 for a total of $ 582,025.80. He testified that he obtained the money from his savings of about $ 75,000, a divorce *665 settlement of $ 170,000, and loans he received from others from 1981 through 1984. He also testified that only a small part of the loan to his parents came from his earnings. He stated that the loans to his parents had no interest rate and no due date. He said that he lent currency and checks to his parents but primarily currency. Mark Conti testified that from 1980 through 1985 people lent him approximately $ 600,000 or $ 700,000. He stated that Oakdale Racquet Club lent him $ 10,000 to $ 15,000 from 1981 to 1984. Mark Conti testified that he received a loan in 1983 from Hybernia Bank (2 percent over prime payable on demand) and successive loans from 1981 through 1983 from the Bank of the Commonwealth (3 percent over prime payable in 2 or 3 years). He testified that both Hybernia Bank and the Bank of the Commonwealth took a personal guarantee from him; thus there was no collateral for those loans. He testified that he was earning between $ 20,000 and $ 30,000 per year at that time. He stated that he made some installment payments, but the loans had not been repaid. Mark Conti testified that he invested the money lent to him, and that he removed money from the investments *666 beginning in 1983. He invested in tennis clubs which were not successful. Mark Conti explained that his investment was not lost because he recovered cash from the sale of assets. Mark Conti testified that he made one small loan to his parents in the 1970s. Mark Conti's testimony about his purported loans to petitioners is implausible and incredible. Petitioners did not mention any loans from Mark Conti during the audit; they first claimed the existence of the loans at trial. We are not convinced that petitioners received loans from Mark Conti. There are no supporting documents, interest, or due dates for the purported loans. Petitioners argue that it is normal not to have such formalities for intrafamily loans. We disagree. The amounts of these purported loans make it unlikely that the loans would be undocumented. d. Petitioners' Experts
Petitioners called two expert witnesses. Petitioners' expert Chauncy Tuttle investigated petitioners' financial affairs on their behalf before trial. His report simply assumes that petitioners' cash hoard claim is true. He testified that petitioners had not told him about any loans from Mark. This undermines petitioners' claim *667 that they received loans from Mark. It is at best unlikely that petitioners would not inform their own expert of such a significant part of their financial situation. Petitioners' expert William Bangela prepared a schedule showing a source and application of petitioners' funds from January 1, 1937, to December 31, 1985. His report does not assist us in deciding the extent of cash on hand on December 31, 1985, because he simply assumed that the cash hoard figures given to him by petitioners were true. For example, based simply on petitioners' claims, the analysis assumes cash on hand as of December 31, 1965, of $ 273,500, cash from Alfred D'Annunzio of $ 300,000, and various cash gifts from Mrs. Conti's mother. His analysis was based primarily on total assets such as cash in banks, stock, life insurance, and real property over the entire lifetime of both petitioners. Mr. Bangela admitted that his analysis/report only shows potential rather than actual cash on hand. He also admitted that petitioners' income was relatively high but he used the Bureau of Labor Statistics low budget for estimating expenses, thus increasing potential cash on hand. e. Opening Net Worth -- Conclusion
*668 A taxpayer's unimpeached, competent, and relevant testimony "may not be arbitrarily discredited and disregarded" by the Court. Loesch & Green Construction Co. v. Commissioner, 211 F.2d 210, 212 (6th Cir. 1954), revg. a Memorandum Opinion of this Court dated Dec. 11, 1952. However, we are not required to accept implausible testimony, particularly in the absence of persuasive corroborating evidence. See Estate of DeNiro v. Commissioner, 746 F.2d 327, 330-331 (6th Cir. 1984), affg. in part and remanding in part T.C. Memo. 1982-497; Lovell & Hart, Inc. v. Commissioner, 456 F.2d 145, 148 (6th Cir. 1972), affg. T.C. Memo. 1970-335; Geiger v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Urban Redevelopment Corp. v. Commissioner, 294 F.2d 328, 332 (4th Cir. 1961), affg. 34 T.C. 845 (1960). The Court may consider circumstantial evidence when deciding the amount of the taxpayer's funds *669 from nontaxable sources. Estate of Mercure v. Commissioner, 448 F.2d 922, 924 (6th Cir. 1971), affg. T.C. Memo. 1969-206; Friedman v. Commissioner, 421 F.2d 658, 659 (6th Cir. 1970), affg. T.C. Memo. 1968-145. We are cognizant of the line of cases in the Sixth Circuit holding that where the taxpayer is confronted with proving nonreceipt of income determined by respondent to be attributable to him, the court should apply a lesser burden to the taxpayer than is normally applied in tax cases. United States v. Walton, 909 F.2d 915, 918-919 (6th Cir. 1990); Weir v. Commissioner, 283 F.2d 675, 679 (6th Cir. 1960), revg. T.C. Memo. 1958-158; Harp v. Commissioner, 263 F.2d 139, 141 (6th Cir. 1959), affg. in part and revg. in part T.C. Memo. 1957-105. Even applying a lesser burden of proof, we do not believe petitioners. Mrs. Conti's testimony was unconvincing. She was at times evasive, self-serving, inconsistent, and selectively *670 forgetful. Mark Conti's testimony was also unconvincing. His testimony was contrived and implausible. The analysis of their experts did little or nothing to validate petitioners' cash hoard and loan claims. We conclude that as of December 31, 1985, petitioners did not have a cash hoard in excess of $ 150,000 or any loans from Mark. f. Leads and Likely Source of Unreported Taxable Income
Respondent must also establish that a reasonable investigation of leads negating possible sources of nontaxable income has been conducted. Holland v. United States, 348 U.S. 121, 135-138 (1954); Smith v. Commissioner, 91 T.C. 1049, 1059 (1988), affd. 926 F.2d 1470 (6th Cir. 1991); Brooks v. Commissioner, 82 T.C. 413, 431-432 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Respondent has met this burden because we have rejected petitioners' cash hoard and loan claims. Respondent has not shown a likely source of petitioners' unreported taxable income. However, proof of a likely source of income is not a prerequisite to *671 use of the net worth method when all possible sources of nontaxable income are negated. United States v. Massei, 355 U.S. 595 (1958); Foster v. Commissioner, 487 F.2d 902, 903 (6th Cir. 1973), affg. T.C. Memo. 1972-188. We note that respondent has the burden of establishing by a preponderance of the evidence the additional unreported income for 1986 asserted after the petition was filed in this case. Rule 142(a); Estate of Schneider v. Commissioner, 29 T.C. 940, 956 (1958); Beck Chemical Equipment Corp. v. Commissioner, 27 T.C. 840, 856 (1957). Since the parties stipulated petitioners' net worth, except for their cash hoard and loan claims which we have rejected, we are persuaded of the additional unreported income. 2. Deductions for Tax Return Preparation Fees and Sales Taxes
Respondent disallowed petitioners' claimed $ 410 tax return preparation fee deduction for 1987 because of the 2-percent floor for miscellaneous deductions. Sec. 67. Petitioners' response to this argument is that the 2-percent floor is not a problem *672 if they establish that they had an $ 800,000 cash hoard and $ 550,000 in loans from Mark. As is discussed above, we reject petitioners' position. Accordingly, petitioners may not deduct the $ 410 return preparation fee for 1987. Respondent disallowed $ 5,047 of petitioners' claimed sales tax deduction for lack of substantiation. At trial, Mr. Grey testified that either Mrs. Conti or Mark Conti gave him a lump-sum sales tax deduction figure without any underlying documentation. Petitioners do not contest this issue on brief. Accordingly, we treat this issue as conceded. [1] See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, 92 T.C. 661, 683 (1989); Money v. Commissioner, 89 T.C. 46, 48 (1987). *673 3. Income From Sales of Residence
Respondent determined that petitioners had $ 893 in additional income in 1986 as gain from the sale of their residence. Petitioners do not argue this issue on brief. Consequently, we treat this issue as being conceded. See Rule 151(e)(4) and (5); Petzoldt v. Commissioner, supra; Money v. Commissioner, supra.
4. Fraud Under Section 6653(b)
Respondent determined that petitioners were liable for the fraud additions to tax under section 6653(b). Petitioners allege that respondent failed to prove fraud by clear and convincing evidence. We disagree. The existence of fraud is a question of fact to be resolved by consideration of the entire record. Parks v. Commissioner, 94 T.C. 654, 660 (1990); Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, supra. *674 First, respondent must prove the existence of an underpayment. Parks v. Commissioner, supra. For fraud purposes, respondent may not rely upon the taxpayer's failure to carry the burden of proof as to the underlying deficiency. Parks v. Commissioner, supra at 660-661; Petzoldt v. Commissioner, supra at 700; Estate of Beck v. Commissioner, 56 T.C. 297, 363 (1971). Second, respondent must show that the taxpayer intended to evade taxes by conduct intended to conceal, mislead, or otherwise prevent tax collection. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111 (1983). a. Underpayment
Respondent may prove an underpayment by proving a likely source of the unreported income, Holland v. United States, 348 U.S. 121 (1954); Parks v. Commissioner, supra; Nicholas v. Commissioner, 70 T.C. 1057 (1978); *675 or where the taxpayer alleges a nontaxable source, by disproving the specific nontaxable source so alleged, United States v. Massei, 355 U.S. 595 (1958); Kramer v. Commissioner, 389 F.2d 236, 239 (7th Cir. 1968), affg. T.C. Memo. 1966-234; Parks v. Commissioner, supra.
Since no likely source of petitioners' unreported income has been shown, respondent must disprove petitioners' allegation of a cash hoard and loans. Respondent may disprove the alleged nontaxable source of income by showing that the reconstruction of income is accurate and that petitioners' allegation of a cash hoard and loans is inconsistent, implausible, and not supported by the objective evidence in the record. Parks v. Commissioner, supra.
Petitioners contend that respondent's determination that petitioners had opening cash on hand of $ 150,000 is incorrect. We have rejected this view. Petitioners also argue that the initial income reconstruction was inaccurate as shown by respondent's changes to the initial determination in the amended answer and again *676 on brief. The refinements to the initial income reconstruction are, in our opinion, the result of changes in information available to respondent, primarily from third parties. Additionally, there was a substantial increase in petitioners' net worth in 1986 and 1987. Petitioners' only explanation for this increase was the claimed cash hoard and loans from Mark. We rejected the cash hoard and loan theories. Accordingly, we conclude that respondent has proved an underpayment. United States v. Massei, supra; Kramer v. Commissioner, supra; Parks v. Commissioner, supra.
b. Fraudulent Intent
Respondent must also prove by clear and convincing evidence that petitioners had the requisite fraudulent intent. Parks v. Commissioner, supra at 664. For purposes of section 6653(b), fraud means "actual, intentional wrongdoing," Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); or the intentional commission of an act or acts for the specific purpose of *677 evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. The courts have developed a number of objective indicators or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Examples of the "badges of fraud" present in this case are: (1) Large understatements of income, (2) inadequate records, (3) implausible or inconsistent explanations of behavior, (4) concealment of assets, and (5) dealings in cash. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. Petitioners' large underpayments are unexplained. We have rejected their theories of a large cash hoard and loans from Mark as incredible. We do not believe the purported sources of the cash hoard, including sales of Nazi weapons during World War II, bootlegging income, and savings from a purported 16 years of expense-free living with Mrs. Conti's mother. We do not believe that Mark made over $ 500,000 in interest-free loans to petitioners when he took out loans on *678 which he had to pay interest. Large unexplained discrepancies between petitioners' actual net income and the net income reported on their tax returns are evidence of fraud. Stone v. Commissioner, 56 T.C. 213, 214 (1971). Petitioners had unreported income in both of the years in issue. Fraud may be inferred from repeated understatements in successive years when coupled with other circumstances showing an intent to conceal or misstate taxable income. Patton v. Commissioner, 799 F.2d 166, 171 (5th Cir. 1986), affg. T.C. Memo. 1985-148; Anderson v. Commissioner, 250 F.2d 242, 250 (5th Cir. 1957), affg. on this issue T.C. Memo. 1956-178. Petitioners did not maintain any records of their alleged cash hoard or loans from Mark. A taxpayer's failure to maintain accurate and complete records, when coupled with other indicia, supports a finding of fraud, as does a taxpayer's failure to supply his bookkeeper or accountant with all data necessary to maintain complete and accurate records. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), *679 affg. T.C. Memo. 1959-172; Reaves v. Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958). Taxpayer's failure to supply complete information about their income and expenses to their tax return preparer is further evidence of fraudulent intent:. Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. per curiam T.C. memo. 1985-63. Petitioners maintained several bank and brokerage accounts. In 1986 Mrs. Conti made at least 43 cash deposits totaling $ 87,450. Her average cash deposit in 1986 was over $ 2,000. Mrs. Conti made at least 15 coin deposits in 1986 totaling over $ 4,000. In 1987 Mrs. Conti made at least 88 cash deposits totaling over $ 290,000. Her average cash deposit in 1987 was over $ 3,300. Petitioners' explanation that the cash and coin deposits came from their $ 800,000 cash hoard or $ 550,000 of loans from Mark is not believable. We believe petitioners are concealing the source of the cash. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499 (1943). *680 A pattern of consistent underreporting of income for a number of years, especially when accompanied by other circumstances showing intent to conceal, such as Mrs. Conti's banking pattern of conduct, is strong evidence of fraud. Holland v. United States, 348 U.S. 121, 137-139 (1954); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37: Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue T.C. Memo. 1965-246; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Petitioners increased the amount that they claimed as their cash hoard as the IRS examination and this case progressed from $ 120,000 at the initial audit interview, to $ 450,000 in a letter from Mr. Grey, to $ 800,000 during this litigation. They also did not claim they received $ 550,000 in loans from Mark until trial. Thus, their oral and written claims as to cash on hand were false and inconsistent. *681 Fraud may be inferred where the taxpayer makes false and inconsistent statements to revenue agents, Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980), or files false documents, Stephenson v. Commissioner, 79 T.C. 995, 1007 (1982), affd. 748 F.2d 331 (6th Cir. 1984). Finally, petitioners had extensive unexplained dealings in currency which indicate fraud. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601. We conclude that respondent has proven fraud by clear and convincing evidence. Accordingly, we hold that petitioners are liable for the additions to tax for fraud under section 6653(b). 5. Substantial Understatement of Income Tax Under Section 6661
Respondent determined that petitioners are liable for the addition to tax under section 6661. Section 6661(a) imposes an addition to tax of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax for a taxable year. A substantial understatement is one which exceeds the greater of 10 percent of *682 the tax required to be shown on the return or $ 5,000. Sec. 6661(b). If petitioners' understatement of income is substantial within the meaning of section 6661(b)(1), they are liable for the section 6661 addition unless the understatement can be reduced under the exceptions contained in section 6661(b)(2)(B). By either test of section 6661(b), petitioners' understatement is a substantial understatement. Petitioners have no authority for their failure to report their cash income, nor did they disclose any facts pertaining to such income on their returns or in a statement attached to their returns. Therefore, the addition cannot be reduced through application of the provisions of section 6661(b)(2)(B). We hold that petitioners are liable for the additions to tax under section 6661. To reflect concessions and the foregoing, Decision will be entered under Rule 155. APPENDIX N/A = no date available. Bloomfield Savings & Loan # 450323-6, for 1986
Deposit Date
Total Deposit
Cash Deposit
Coin Deposit
January 8
$ 1,747.83  $ 550   $ 100  January 17
2,000.00
2,000
0
January 17
3,210.67
900
0
January 21
5,100.00
2,600
0
February 3
3,426.66
2,000
200
February N/A
6,177.36
1,300
0
March 3
3,875.98
600
110
April 4
2,558.09
0
0
April 11
7,210.75
1,500
200
April 22
2,000.00
2,000
0
May 7
2,517.94
1,500
100
May N/A
9,661.86
1,600
0
June 11
2,000.00
2,000
0
June 17
13,000.00
3,000
0
June 30
2,911.46
2,500
0
July 3
3,994.94
1,000
0
July 21
4,500.00
4,500
0
July 28
8,061.16
2,500
360
August 1
3,930.46
1,000
200
August 11
29,457.11
3,000
0
August 13
2,000.00
2,000
0
August N/A
2,629.44
2,000
0
August 21
4,000.00
1,600
0
August 25
6,083.16
2,000
0
August 2
2,717.94
1,400
400
September 22
3,000.00
2,500
500
Totals     $ 137,772.81
$ 47,550
$ 2,170
*683 Standard Federal Savings #041-500-4457, for 1986
Deposit Date
Total Deposit
Cash Deposit
Coin Deposit
September 10
$ 3,027.94
$ 2,000
$ 0  September 16
2,620.00
1,000
250
September 24
2,500.00
2,000
500
September 26
5,000.00
2,000
0
September 29
7,000.00
2,000
0
October 8
9,082.09
2,000
400
October 9
2,199.42
1,000
132
October 23
7,886.12
2,000
0
October 28
4,651.92
3,000
0
November 4
5,015.09
3,000
0
November 10
$ 5,350.00 $ 4,000
$ 300
November 11
2,613.37
2,600
0
December 4
3,877.00
1,500
300
December 26
17,201.01
2,000
0
Totals         $ 78,023.96
$ 30,100
$ 1,882
Sterling Savings #0-02-60-150581, for 1986
Deposit Date
Total Deposit
Cash Deposit
Coin Deposit
October 27
$ 4,000
$ 4,000
$ 0
November 24
2,000
2,000
0
December 12
1,500
1,500
0
December 29
2,300
2,300
0
Totals     $ 9,800
$ 9,800
$ 0
Bloomfield Savings & Loan #10-01-040074-7, for 1987
Deposit Date
Total Deposit
Cash Deposit
Coin Deposit
February 4
$ 850.00  $ 0     $ 0
February 5
2,600.00
0
0
February 24
425.00
0
0
February 24
4,674.00
0
0
February 27
2,526.00
0
0
March 2
850.00
0
0
March 4
1,040.00
0
0
March 4
1,500.00
0
0
Unknown date
50.00
0
0
March 19
2,000.00
0
0
March N/A
3,450.00
0
0
April 15
1,040.00
0
0
April 23
2,033.00
0
0
April 29
3,450.00
0
0
May 11
1,040.00
0
0
May 26
4,000.00
4,000
0
May 28
6,100.00
3,500
0
June 1
4,425.00
3,500
0
June 3
5,000.00
3,000
0
June 4
3,000.00
3,000
0
June 8
4,540.00
3,500
0
June 11
3,500.00
3,500
0
June 18
4,500.00
4,500
0
June 24
3,500.00
3,500
0
June 25
5,000.00
5,000
0
June 29
4,600.00
2,000
0
June 29
$ 5,040.00  $ 4,000 $ 0
July 1
2,000.00
0
0
July 14
4,000.00
4,000
0
Totals     $ 86,733.00 $ 47,000
$ 0
38,186.78
20,650
$ 124,919.78
$ 67,650
*684 Bloomfield Savings & Loan # 03-02-0590431-3, for 1987
Deposit Date
Total Deposit
Cash Deposit
Coin Deposit
January 21
$ 3,500.00 $ 3,500 $ 0
February 10
2,750.00
2,750
0
March 13
2,400.00
2,400
0
May 13
3,600.00
3,600
0
May 18
2,500.00
2,500
0
September 23
3,500.00
3,500
0
October 30
4,900.00
2,400
0
November 23
15,036.78
0
0
Totals     $ 38,186.78
$ 20,650
$ 0
Standard Federal Savings # 041-500-4457, for 1987
Deposit Date
Total Deposit
Cash Deposit
Coin Deposit
January 5
$ 4,189.00
$ 2,000
$ 300
January 7
4,640.49
2,500
200
January 15
6,290.87
3,500
0
January 21
3,146.73
2,500
0
January 28
2,809.98
2,300
0
February 3
5,630.00
2,500
130
February 5
3,275.49
2,000
0
February 10
4,050.00
3,000
0
February 13
13,383.78
3,825
0
February 24
15,881.61
3,000
0
March 4
[2] 3,000.00 2,000
0
March 17
2,708.77
2,000
200
March 27
3,877.80
3,000
0
April 2
4,969.00
1,000
0
April 15
3,398.00
3,000
0
April 22
3,874.52
3,200
0
April 30
13,151.00
3,000
0
May 4
3,967.00
2,000
0
May N/A
2,597.30
2,000
0
May 13
$ 2,538.70  $ 2,000 $ 0    May 15
3,772.00
3,400
270
May 21
2,350.00
2,000
0
May 26
10,110.00
4,000
0
June 3
3,105.00
2,000
0
June 5
3,868.77
3,000
0
June 11
15,123.00
4,000
0
June N/A
1,926.43
1,400
0
July 8
5,265.93
3,000
0
July 13
3,500.00
3,000
500
July 17
2,965.36
2,000
200
July 24
5,223.46
2,000
400
August 14
5,530.90
4,000
0
September 5
15,361.75
0
0
September 14
2,984.55
1,000
0
September 23
6,154.00
0
0
September 30
4,162.76
0
0
October N/A
2,500.00
0
0
October N/A
3,000.00
0
0
Totals     $ 204,283.95
$ 85,125
$ 2,200
*685 Sterling Savings # 0-02-60-150581, for 1987
Deposit Date
Total Deposit
Cash Deposit
Coin Deposit
January 13
$ 2,000.00
$ 2,000   $ 0
February 25
2,000.00
2,000   0
April 25
2,000.00
2,000   0
May 14
2,000.00
2,000   0
July 1
1,900.00
1,900   0
July 14
6,935.00
6,935   0
July 27
414.34
0   0
July 30
6,757.95
0   0
July 30
2,600.00
0   0
July 30
828.80
0   0
July 30
491.00
0   0
August 6
102.00
0   0
August 6
2,000.00
0   0
August 6
1,040.00
0   0
August 6
11,524.92
0   0
August 10
5,100.00
5,100   0
August 10
1,128.95
0   0
August 11
5,000.00
5,000   0
August 12
6,000.00
6,000   0
August 13
4,000.00
4,000   0
August 13
1,530.90
1,530.90
0
August 14
10,000.00
0   0
August 14
2,000.00
2,000   0
August 17
3,000.00
3,000   0
August 21
7,000.00
7,000   0
August 21
75.00
0   0
August 21
$ 18.00   $ 0       $ 0
August 22
5,000.00
5,000   0
August 24
500.00
0   0
August 24
6,000.00
6,000   0
August 25
6,510.00
6,510   0
August 26
5,000.00
5,000   0
August 26
950.00
0   0
August 26
1,525.00
0   0
August 27
20.00
0   0
August 27
666.00
0   0
August 27
1,462.50
0   0
August 31
1,500.00
1,500   0
August 31
2,600.00
0   0
September 2
6,000.00
6,000   0
September 3
6,000.00
6,000   0
September 3
625.00
0   0
September 5
3,143.00
3,143   0
September 5
2,000.00
0   0
September 5
317.66
0   0
September 5
40.00
0   0
September 9
5,000.00
5,000   0
September 10
6,500.00
6,500   0
September 11
3,000.00
3,000   0
September 14
8.00
0   0
September 14
99.84
0   0
September 14
75.00
0   0
September 14
88.92
0   0
September 16
4,525.00
4,525   0
September 17
7,000.00
7,000   0
September 17
1,782.54
0   0
September 18
2,000.00
2,000   0
September 18
196.12
0   0
September 21
628.91
0   0
September 21
445.63
0   0
September 30
25.60
0   0
September 30
2.00
0   0
September 30
625.00
0   0
September 30
2,600.00
0   0
September 30
30.00
0   0
October 2
2,000.00
0   0
October 2
97.53
0   0
October 6
50,774.65
0   0
October 6
589.81
0   0
October 6
950.00
0   0
October 13
30.00
0   0
October 13
45.00
0   0
October 13
203.50
0   0
October 13
26.32
0   0
October 21
71,933.51
0   0
October 22
11,000.00
0   0
October 27
2,600.00
0   0
October 27
$ 7,000.00
$ 7,000   $ 0
October 27
45.82
0   0
October 27
83.67
0   0
October 29
600.00
0   0
October 29
20,000.00
0   0
October 30
2,000.00
0   0
November 3
1,040.00
1,040   0
November 3
950.00
0   0
November 3
20,000.00
0   0
November 9
39.33
0   0
November 9
50.00
0   0
November 9
40.00
0   0
November 9
80.00
0   0
November 12
81.00
0   0
November 12
75.88
0   0
November 12
1,094.81
0   0
November 12
20.00
0   0
November 16
1,200.00
0   0
November 16
65.75
0   0
November 16
24.00
0   0
November 25
800.00
800   0
November 25
950.00
0   0
November 25
40.00
0   0
November 25
2,000.00
0   0
November 25
325.00
0   0
November 25
500.00
0   0
November 25
33.73
0   0
November 25
2,500.00
0   0
November 30
8.81
0   0
November 30
250.00
0   0
November 30
303.75
0   0
November 30
1,250.00
0   0
November 30
65.75
0   0
December 3
1,040.00
0   0
December 3
300.00
0   0
December 3
20.00
0   0
December 8
1,600.00
1,600   0
December 9
1,500.00
0   0
December 9
2,600.00
0   0
December 17
300.00
0   0
December 17
12.00
0   0
December 17
116.25
0   0
December 21
10.00
0   0
December 21
6.75
0   0
December 21
5,000.00
5,000   0
December 21
47.18
0   0
December 21
674.35
0   0
December 21
85.00
0   0
December 22
4,000.00
4,000   0
December 22
374.00
0   0
December 22
139.35
0   0
December 29
$ 1,500.00  $ 0         $ 0
December 29
1,807.61
0   0
December 29
365.00
0   0
December 30
1,000.00
1,000   0
December 30
1,200.00
0   0
Totals     $ 399,403.69
$ 138,083.90
$ 0
*686 Footnotes
1. Not in record.↩
1. We note that in the opening brief respondent proposed an ultimate finding of fact that petitioners are entitled to additional rental depreciation of $ 5,047 for 1986. Petitioners did not object to this finding. However, we conclude that petitioners are entitled to $ 5,369 disallowed in the notice of deficiency as additional rental depreciation.↩
2. This amount was illegible and may exceed $ 3,000.↩